**BOUKER CONTRACTING CO. v. WILLIAMSBURGH POWER PLANT CORPORATION.**

**THE 73-H.**

**No. 331.**

Circuit Court of Appeals, Second Circuit.

July 31, 1942.

William C. Chanler, Corp. Counsel, of New York City (George Seagrave Franklin and Martin Faust, both of New York City, of counsel), for respondent-appellant.

Foley & Martin, of New York City, (Christopher E. Heckman, of New York City, of counsel), for libellant-appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a libel in admiralty filed by Bouker Contracting Company, owner of the dump scow 73–H, to recover damages occasioned by the sinking of its barge at the plant of the respondent, Williamsburgh Power Plant Corporation, through the negligence of the latter's employees in placing the scow at a berth where there would be insufficient water at some stages of the tide to float her when fully loaded. The District Judge granted an interlocutory decree in favor of the libellant, but only allowed half damages on the ground that the latter had itself been guilty of contributory negligence. The respondent has appealed and the libellant has filed cross-assignments of error, each contending that the other was wholly responsible for the accident.

The Williamsburgh Power Plant Corporation, hereafter to be called the Corporation, owned and operated a plant along the Wallabout Channel, commencing at Division Avenue and running south for some distance, where it berthed scows on which it loaded ashes accumulated at its plant. On January 23, 1939, the Corporation and the libellant made an agreement whereby the libellant was to remove in dump scows ashes that accumulated from the Corporation's power plant. The scows required for this removal were to be provided by the libellant, which was to do all the towing and winding of the scows and other work incident to the removal of the ashes. The Corporation was to load the ashes and to do such trimming as might be required. The libellant was also to remove all scows promptly upon notification of their loading. Clause 5 of the contract provided as follows: "5. The 'Contractor' assumes all the responsibility and risk incident to the work herein contemplated to be done by the 'Contractor,' including those risks arising from the negligence or the alleged negligence or acts of nuisance or alleged acts of nuisance of any person engaged in or connected with said work, * * * The 'Contractor' shall not be liable for any negligence of the 'Corporation' or its employees."

Pursuant to the agreement the libellant's tug "Bouker No. 6" towed its scow 73–H to the Williamsburgh Plant on Friday, July 7, 1939, and moored her outside another scow which was lying alongside the bulkhead. The next morning (Saturday, July 8th) the Corporation's shore gang swung her around and inshore to a position in which her stern was close to the northerly end of the bulkhead near Division Avenue, where it was ready to be loaded. Two other scows were moored outside of her. The bargee, Petersen, attended the lines at the time the 73–H was moored alongside the bulkhead, but almost immediately afterwards left her to go to the Bouker Office in New York City to get his pay, and then went about his own business and did not return until Monday morning. The employees of the Corporation proceeded to load the 73–H, and had her fully loaded by three o'clock Sunday afternoon, July 9th.

No attempt was made to move the 73–H after she had once been moored along the bulkhead. A little while before one o'clock on the morning of Monday, July 10th, she was observed to list and shortly thereafter to sink. The Corporation's night watchman tried to communicate with some representative of the libellant when he noticed that vessel was in danger, but could neither find the bargee, who was ashore, nor get in touch with the New York Office, nor anyone representing it.

The trial court made a finding upon ample evidence that there was insufficient water along the northerly end of the bulkhead to float a dump scow with a draft of eleven feet, which the 73–H had after she was loaded. There was proof that the depth of water at the stern port corner of the barge was only about seven feet, and was but eleven feet at a point ten feet from the bulkhead. Toward the forward end of the barge the depth along the bulkhead varied from twelve to fourteen feet; and about five feet out in the channel the depths were (at intervals of twenty feet), 13 feet, 6 inches; 14 feet, 6 inches; 14 feet, 9 inches; 9 feet; 9 feet, and 14 feet, 6 inches. These variations in depth support the further finding that: "On the low water following completion of her loading the inshore corner of the '73–H' hung up, causing her to list off shore and forward, which strained the scow and caused her to leak and sink."

There can be no question about the correctness of these findings, nor is there any question that the scow was moored by the Corporation in a berth which was unsafe for her at low tide when she was loaded, and that instead of moving her to deep water after loading had been completed, it left her in a foul berth over a low tide.

The Corporation urges two defenses. The first is assumption of risk. In support of this it argues that the bargee knew of the hump in the berth because only two or three months before the accident he had had difficulty in keeping his scow afloat at low tide, though she was only three-quarters loaded. On that occasion he found that she was lying on a hump caused by dirt from the adjacent sewer pipe and from ashes spilled from the crane which loaded the scows. As authority for its claim of an assumption of risk the Corporation cites our decision in United States Trucking Corp. v. City of New York, 18 F.2d 775, where we held that it was a sufficient discharge of the duty of a wharfinger to warn vessels using its wharf of its unsafe character, but said that warning would be dispensed with if the owner of the injured vessel already had knowledge of the unsafe condition of the berth. The Imp, D. C.N.Y., 225 F. 668. Those decisions do not apply to the present case. Here the berth was safe for the barge so long as she was not so heavily loaded as to smell the bottom at low tide. The respondent knew or was bound as a wharfinger to know the condition of its berth; and since it had placed the 73–H in a berth of uneven bottom and had the only available source of power (an electric winch) for shifting barges, it was under a plain duty to move her to deeper water before low tide. The only question, aside from Section 5 of the contract (which we shall discuss hereafter), is whether the foundering of the vessel was due to the contributory fault of libellant's bargee in leaving the scow unattended for two days. It was on the basis of this fault that the District Judge divided the damages.

█ The trial court made no finding that the Corporation actually knew of the lump in the berth near Division Avenue. But it seems quite evident from its opinion that it concluded that the Corporation did not know of it. This finding may also be inferred from Conclusions of Law 3 and 4, to the effect that it was the duty of the bargee to protest against being placed in the berth. Moreover, Petersen testified that he made no objection to being placed there and left no instructions with the shore gang (whom he could hardly have supposed to be as familiar as himself with the weaknesses of scows), even though in the spring of 1939 he had been obliged to suspend loading until the tide rose, and even though, according to his testimony, he had since sometimes found it necessary to have his scow moved by the shore gang because of the hump. As the trial judge pointed out, all of the employees who were called by the respondent denied ever being informed by the bargeman of his previous troubles when loading the scow, and it seems unlikely that the Corporation would have placed her in the berth and given no attention to shifting her before low tide if it had had knowledge of the dangerous lump and of the bargee's earlier experience. There can be no doubt that the Corporation as wharfinger was liable for furnishing a berth that would be unsafe for this scow at low water. As wharfinger it was bound to know the unsafe condition and as consignee to shift her when the water became too low to float her. The Eastchester, 2 Cir., 20 F.2d 357. But the bargee was also under a duty to warn the Corporation of the condition of the pier, especially since he intended to be absent when she would have to be moved. Moreover, it was the duty of the libellant, if its scows were to be unattended by their bargees during times of danger to make provision for notifying it of any troubles that might overtake them. Here no such provision was made and the Corporation's night watchman could get no assistance from libellant when he found the scow in danger. But we think that the bargee himself should have been on duty to assist with his lines and with his knowledge (which the shore gang should not be expected to possess) both of the draft of the scow under increasing load and of the location of the hump near the southwest corner of the bulkhead. He might have eased her lines in the falling tide so that she could slide out into deeper water, and also might have used his pumps when she began to leak in order to keep her afloat until she could be towed to safety.

We agree with the trial judge that the case was one of contributory negligence as between libellant and respondent.

█ Finally, the respondent argues that under Section 5 of the contract, which we have already quoted, libellant assumed the risk of such damage as happened to the

barge and is, therefore, barred from any recovery. By the first clause of this section the libellant "assumes all the responsibility and risk incident to the work herein contemplated to be done by the 'Contractor,' including those risks arising from the negligence * * * of any person engaged in or connected with said work." We think the clause clearly aims at indemnifying the Corporation for the negligence of the libellant and its servants in cases where the Corporation might otherwise have to respond in damages. But the "work * * * to be done by the 'Contractor'" did not include providing the berth, loading the scow, or shifting her to deeper water when the berth became unsafe for a heavily loaded vessel of her draft. Consequently, there was nothing in the circumstances of this case to which the first clause of Section 5 applied. But to make it certain that libellant never agreed to stand the loss of the Corporation's own negligent acts, the section concludes with the words: "The 'Contractor' shall not be liable for any negligence of the 'Corporation' or its employees."

Decree affirmed.

CLARK, Circuit Judge (dissenting).

At best this is a weak claim; to my mind it is barred under the "Agreement" of the parties. This sealed contract of thirteen detailed paragraphs—too long for even summary in a dissent—was obviously designed to set forth the relations of the parties in full. Contrary to the suggestion of the opinion, the "work" is defined and continually referred to as the whole job of removal of the ashes by the Contractor, which included the placing of the scows in position for loading; moreover, "the 'Contractor' shall do all towing and winding of the scows and other work incident to the removal of said power house ashes, fly ash and waste material as may be necessary, at its own expense," etc. By paragraph 5—of which less than a quarter is quoted in the opinion—the Contractor assumes complete responsibility for this work, including negligence or nuisance, actual or alleged, "of any person engaged in or connected with said work." (All italics are mine.) Then follows the part omitted from the opinion, which is most necessary for the correct understanding of the short final sentence. Here appeared detailed provisions for indemnification of the Corporation by the Contractor for liability for all claims or suits in connection

with said work, even for attorney's fees, with special provisions as to lump sum payments to cover the Corporation's liability, under not merely the Federal Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., but also the State Workmen's Compensation Law, Consol.Laws c. 67. In view of this, it was rather natural to add that "the 'Contractor' *shall not be liable for*" the Corporation's negligence. That is, the *duty* of reimbursement did not go that far. But to make that limitation on libellant's duty read as though it also included a *right*—a right to damages for negligence—is, of course, to bring in something which was both without connection with the matter immediately preceding it and at variance with the first sentence of the paragraph, as well as not within the ordinary content of the language used. More reasonably, the Contractor's assumption of responsibility for the negligence of *any* person connected with the work should be held to apply to the matters in issue here.