COLONIAL SAND & STONE CO., Inc., as owner of the SCOW WINDOW-LIGHT, also known as the C-8, Libellant-Appellee,

v.

FEHLHABER CORPORATION, Respondent-Appellant.

No. 83, Docket 28272.

United States Court of Appeals Second Circuit.

Argued Oct. 22, 1963.

Decided Jan. 7, 1964.

---

Max Taylor, New York City (Maurice A. Krisel and Krisel, Beck & Taylor, New York City, on the brief), for libellant-appellee.

Richard E. Shandell, New York City (Desmond T. Barry and Barry, Treanor, Shandell & Brophy, New York City, on the brief), for respondent-appellant.

Before LUMBARD, Chief Judge, and MEDINA and FRIENDLY, Circuit Judges.

MEDINA, Circuit Judge.

In the early hours of the morning of August 13, 1958 the scow Windowlight, owned by Colonial Sand & Stone Co., Inc., sank at her berth alongside a bulkhead furnished by Fehlhaber Corporation in connection with the construction of the Throgg's Neck Bridge. Judge Knox, whose opinion containing his findings is not reported, sustained Colonial's libel and held Fehlhaber solely responsible for the damage suffered by the Windowlight. Fehlhaber appeals and we affirm.

As Fehlhaber by written contract agreed to provide "250 feet of useable bulkhead with 10'-0" of water at low tide," there can be no reasonable doubt on the question of liability, if the sinking of the Windowlight was caused by stubs of concealed spiles protruding from the sandy bottom to such an extent as to reduce the clearance at low tide to less than ten feet. Paragon Oil Co. v. Republic Tankers, S.A., 2 Cir., 1962, 310 F. 2d 169, cert. denied, 1963, 372 U.S. 967, 83 S.Ct. 1092, 10 L.Ed.2d 130; Nassau Sand & Gravel Co. v. Red Star Towing & Transportation Co., 2 Cir., 1932, 62 F.2d 356. The burden of proof was concededly on Colonial.

While Judge Knox does not say so explicitly, it is perfectly clear from his opinion that he reached the factual conclusion that the sole cause of the sinking of the Windowlight was damage caused at or about dead low water during the early morning hours of August 13, 1958 by one or two submerged spiles, the remains of an old abandoned voluntary life-saving station. In view of the proofs taken by Judge Knox these spiles, protruding "about three or four feet above the bottom of the berth," caused such injury to the underplanking of the Windowlight as to admit a volume of water that no amount of pumping could cope with.

Appellant attacks these findings from every conceivable angle. The testimony of some of the witnesses is said to be "inherently incredible." It is claimed that "there is no proof that the berth was unsafe or that any foul condition of the berth was responsible for the damage to the scow." There is reference to "guessing and speculating"; and our attention is directed to a large number of alleged inconsistencies and discrepancies in the proofs, and to the alleged improbability that the sinking could be attributed to any cause other than the one suggested by appellant, which Judge Knox rejected.

As all questions of credibility were for the trier of the facts to determine, and as it was also the function of the trial judge after having reached a conclusion as to what portions of the testimony of each witness he believed and what portions he did not believe, to put these fragments of the proofs together and draw inferences of fact in deciding the case, we shall not attempt any gen-

eral summary of everything disclosed by the proofs. We deem it sufficient to describe the basic evidentiary matters which we think give substantial support to the factual conclusions arrived at by Judge Knox.

In order to prosecute the work of laying the foundations for the Throgg's Neck Bridge appellant created an island by putting a steel bulkhead out in the East River, sand was dredged into this artificial island, and an anchorage was built through the island, with appellee's plant at one end. Edward T. Buchanan, Marine Superintendent of one of appellee's subsidiaries, on whose testimony Judge Knox relied, testified that he had resided in the Bronx, New York, for many years and he recalled that prior to 1945 or 1946 there had been a lifesaving station in the vicinity of the place where the island was constructed, that it had a wooden building and a pier "about 125 feet in length," all of which had long since been abandoned. After the sinking of the Windowlight a skindiver examined the bottom under the location of the Windowlight's berth and found a considerable number of spiles, including two the tops of which were badly splintered and which protruded about three or four feet from the bottom of the berth. We shall return to these later. Suffice it to say, at this point in our narrative, that these various spiles were removed a few days after the sinking, and the photographs in evidence make further description unnecessary.

There is proof by other witnesses to the effect that at the time of the dredging no attempt was made to comb the bottom by drawing a line across it, as those in charge thought it sufficient to drop a weighted plumb line "into the water, at various intervals, or spaces," and to drag a clamshell bucket across the bottom. Judge Knox correctly inferred from this testimony that, while these crude methods might have given a fair notion of the general depth of the water, they would not necessarily have revealed the presence of the spiles later found by the skindiver.

The Windowlight was moored, port side to the bulkhead, and the unloading of her cargo of about 650 to 750 cubic yards of wet washed sand commenced about noon on August 12, 1958. When half the cargo had been removed from her forward and stern ends and amidships, the work of removal stopped. The scow was left on an even keel with a draft at that time estimated at six or seven feet. At low water that afternoon nothing unusual was noticed. But at 4 A.M. on August 13, 1958 the Captain of the scow found she was aground but with no indication that she was in any danger. It was dead low water that morning, according to the official tide records, at 5:18 A.M., and at about 6 A.M. one of appellant's runners informed the Captain she was in trouble. There was already three feet of water in the scow and the pumps were not equal to the task of keeping her afloat.

One of the most significant aspects of the case is the position of the scow after she sank. Instead of resting on an even keel, as one might expect to be the case if she was on a sandy bottom, the scow was cocked up. Her port bow corner was "hung up," she was listed sideways outboard from the bulkhead. Her main deck was covered with water, except for one small area, while her stern was under water which came "halfway up on the windows of the boat's cabin."

When the tug Gene Pope arrived, Buchanan took charge. Thinking the stern of the Windowlight might be on the sandy bottom Buchanan put a line on her stern and when the tug took the burden the scow simply came out from the bulkhead at a 90 degree angle. She did not come off. So they pushed her back. Then a 6-inch nylon hawser was put on her bow, but the hawser broke and she remained hard fast. In the meantime some of the remaining cargo had been removed and she came up "pretty near decks to." Finally, a cable was put on and they were able to pull her off.

Putting the testimony of the skindiver and that of Buchanan together with the survey made in the shipyard, we think

the inference that the damage suffered by the scow was about 22 or 23 feet from her bow end and 3 to 6 feet from her port side and that this is just about where at least one of the splintered spiles was found by the skindiver, is in every way reasonable and proper.

The one thing missing was proof by someone who had examined the damage to the bottom of the scow at the shipyard before the repairs were made. A description of the hole or holes or the shattering of the planking by an eyewitness who could fix the exact spot and give the measurements would have been helpful. But we are not persuaded that the absence of such proof is a fatal defect in appellee's case. The scow was 119 feet long, with a beam of 36 feet. The survey sufficiently indicates the bottom planks to be removed and replaced to justify the factual conclusion, drawn from the facts and circumstances above described, that the damage was caused by one if not by both of the splintered spiles the skindiver found protruding about three or four feet from the bottom under the Windowlight's berth.

Affirmed.