**BILKAY HOLDING CORPORATION,**
Plaintiff,

v.

**CONSOLIDATED IRON & METAL COM-
PANY, Inc., Defendant and Third-
Party Plaintiff,**

v.

**ZELLER MARINE CORPORATION and
Red Star Towing & Transportation
Company, Third-Party Defendants.**

**No. 66 Ad. 344.**

United States District Court,
S. D. New York.

Aug. 17, 1971.

Foley & Martin by Christopher E. Heckman, New York City, for plaintiff and third-party defendant Zeller Marine Corp.

Enrico S. Sanfilippo, New York City, for defendant and third-party plaintiff.

McHugh & Leonard by James M. Leonard, New York City, for third-party defendant Red Star Towing & Transp. Co.

CANNELLA, District Judge.

This is yet another admiralty action involving the use of scows by the Con-

solidated Iron & Metal Company, Inc. [hereinafter "Consolidated"] for the transportation of its scrap. In this particular case, Consolidated had contacted the Zeller Marine Corporation [hereinafter "Zeller"] on November 29, 1965 and asked that an empty scow be delivered the next day to the Consolidated bulkhead on the Hudson River at Newburgh, New York. Zeller then arranged with Gallagher Bros. Sand & Gravel Corporation for the charter of plaintiff's welded steel deck scow, the Bilkay No. 4,[1] and with the Red Star Towing & Transportation Company [hereinafter "Red Star"] for a tugboat to tow the unmanned and non-self-propelled Bilkay to Newburgh.

Subsequent to the scow's arrival on November 30th,[2] Consolidated began loading it by means of an electromagnet-equipped crane with no. 2 bales of scrap iron approximately two feet square by five feet long and weighing between 1700 and 2000 pounds.[3] When the loading neared completion on December 6, 1965, Consolidated contacted Zeller and asked it to arrange to have the Bilkay towed to Port Elizabeth, New Jersey the next day.

Red Star's tug Rockland County arrived at Consolidated's dock at approximately 1400 hours on December 7th and was informed by Gallagher's "runner",[4] one James Hines, that the scow was not yet ready for towing. The court finds that the reason for the delay was that Hines had ordered the crane operator to move a number of bales scattered at random on top of the completed fifth tier[5] inward toward the port side of the vessel.[6] After this process was completed about an hour and a half later, the Rockland County made up, pushboat fashion, to the Bilkay, with the tug's bow pushing knees drawn fast to the scow's stern by means of winch-tightened "face wires" or cables attached to corner cleats on the barge. The tug and scow then backed out into the Hudson through an arc of about 180 degrees and headed down the river. First Mate McCullough, who was at the controls of the Rockland County during this maneuver, testified, and the court so finds, that after the Bilkay had been pulled away from Consolidated's bulkhead, her slight list to starboard became a slight list to port,[7] with

1. At the time in question, Gallagher Bros. Sand & Gravel Corporation [hereinafter "Gallagher"] was "handling the operations" of the Bilkay No. 4, a scow with rake ends, square chines, a cargo area delimited by steel cargo rails three feet six inches high running two feet inboard from each side and end cargo bulkheads eight feet high and about ten feet inboard from each end; and with dimensions of 130 feet long by 38 feet wide by eleven feet six inches high internally divided into two rake spaces and two mid-body spaces by transverse bulkheads approximately 15 feet from each end and by a midlength transverse bulkhead. See generally Consolidated Exhibit E.

2. The Bilkay was tied up in essentially a north-south position, with the bow facing north and the port side riding against Consolidated's bulkhead.

3. The method of loading employed was to place the bales, one at a time, in tightly packed rows, working outward from the port or inshore side of the cargo box.

In all, five full tiers of bales were placed on board, with the sides of the bottom three flush with the cargo rails and/or their planes. The sides of the fourth tier were set inboard somewhat from those of the lower tiers, with the sides of the fifth tier stepped inward even further.

4. The role of such a person is essentially the same with regard to unmanned scows as that of a scow captain on manned barges. Mr. Hines, in fact, had previously been a scow captain.

5. The crane operator testified that his general practice was to load all of the bales sent down to the dock from Consolidated's plant and that pursuant thereto in this case he had "scattered" the remaining bales around on top of the fifth tier.

6. The first mate of the Rockland County testified, and the court so finds, that when the tug first arrived, the Bilkay was listing slightly to starboard and that the shifting of the bales to port did not appreciably alter this starboard list.

7. See Trial Minutes, p. 71.

freeboard of approximately six to eight inches.[8]

The Bilkay arrived in calm water off Tomkins Cove, New York at about 6 p. m. on December 7th, and its starboard side was eased along the port side of the outermost scow of a number of others moored there. After one line had been put out at the bow, first the port face wire from the tug, then the starboard face wire, were released whereupon the Bilkay began taking a steadily increasing list to port to the extent that a number of bales fell off into the water. The scow then careened to starboard, dumping more bales into the water (and onto the barge alongside) and dragging that scow down. The taut bow line was cut immediately, and the Bilkay then settled somewhat to a starboard list of approximately 45 degrees with part of the bottom out of the water and the cargo box partially submerged. At this point, the Rockland County maneuvered around and tied on to the bow of the scow and slowly pulled it out into the river, then gently pushed it partially onto a nearby sandy beach. This maneuver put the Bilkay on an even keel (with the inshore end higher) whereupon the water in the cargo box gushed through cutouts in the cargo rails. After this water had run out, the tug pulled the scow off the sand, made fast with the face wires and pushed the Bilkay, which was listing again, across the river to a pier at Verplanck where the hull was sounded for water and pumped out. The next day, December 8th, the scow continued its voyage down the Hudson with the remaining bales.

On December 16, 1965, the Bilkay was examined in drydock at Jersey City, New Jersey. Two marine surveyors, one representing the plaintiff and the other the cargo interests, found damage to bottom plates on the port side and to the various longitudinals attached to those plates. See generally plaintiff's Exhibit 6, Consolidated Exhibit D. A soaping of the seams and filling of the compartments with compressed air failed to divulge any leaks in the hull.

* * *

The plaintiff filed its libel against Consolidated on April 6, 1966; it was subsequently amended to include not only the claim for the damage to the scow, but also a claim for the charter hire, which has never been paid by Consolidated to anyone. In the meantime, Consolidated had impleaded Zeller and Red Star on June 30, 1966, the last effective day of Rule 56 of the Admiralty Rules,[9] alleging, *inter alia*, that if it— Consolidated—is liable, "then any and all such liability was caused by the * * * negligence and breach of the obligations and duties of * * * Zeller for its failure to provide a seaworthy vessel * * * and/or the * * * negligence and breach of the obligations and duties of * * * Red Star in the towing and/or maneuvering of [the] Bilkay * * * [and] Red Star and Zeller should be proceeded against directly in this Court by the [plaintiff]."[10]

This Court has jurisdiction pursuant to 28 U.S.C. § 1333(1).

To deal first with the plaintiff's claim for the charter hire, the court finds that Zeller's role in the transaction giving rise to the claim was nothing more than what its letter—and billheads indicate, to wit, "marine transportation

8. See *id.* at 75–78.

9. Cf. Rule 14(c) of the Federal Rules of Civil Procedure (F.R.Civ.P.).

10. The various contentions of all the parties are summarized in the official minutes of the trial of this case, pp. 5–22. Counsel for Red Star argues in his post-trial brief, as he did during his opening, that the plaintiff is not entitled to proceed directly against his client. But both old Rule 56 and present Rule 14(c) provide that suits such as the one here "shall proceed" as if the third-party defendant had been originally proceeded against, and the court notes in this regard that Red Star filed an answer to the plaintiff's amended complaint on October 19, 1967. See also Rule 15(b), F.R.Civ.P.; Pre-Trial Order.

*agents"* [11]—acting on behalf of the plaintiff barge owner. The fact that the plaintiff was an undisclosed principal does not sustain Consolidated's defense of lack of privity of contract here where the contract or so-called "New York harbor oral charter" was nothing more than a brief telephone call to Zeller on November 29, 1965 and where, as a matter of practice, "it did not matter to Consolidated what scows were used." [12] Consolidated, as charterer, is therefore liable to the plaintiff owner for the unpaid charter hire.

The court does not doubt for a moment that it often "can be very confusing to try to pinpoint the origin or the cause" of structural damage. [13] However, the evidence in this case (1) that scows were frequently aground at Consolidated's dock and that they could only be moved away at or near high tide; [14] (2) that the water level was approaching low tide at the time the Rockland County made fast to the Bilkay; [15] (3) that the estimated depth of the water at the Consolidated bulkhead at low tide was ten and one half to eleven feet; [16]

11. See plaintiff's Exhibits 2, 13; Consolidated Exhibit G. See also Trial Minutes, pp. 472, 477–78, 482, 494–95.

12. Consolidated's Proposed Findings of Fact and Conclusions of Law, p. 2.

13. Trial Minutes, p. 368. The United States Supreme Court has pointed out that:

> Fact finding does not require mathematical certainty. [The trier of fact is] supposed to reach * * * conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn.

Schulz v. Pennsylvania R.R. Co., 350 U.S. 523, 526, 76 S.Ct. 608, 610, 100 L.Ed. 668 (1956).

14. The Rockland County's master testified by way of deposition prior to trial as follows:

> Q Did I understand you to say that you know of your own knowledge that scows are frequently aground at the Consolidated loading plant in Newburgh?
> A Oh, yes.
> Q You have seen them aground, have you?
> A Oh, yes. I have been up there and had orders to take them out of there, and couldn't take them out of there. I had to wait until high water.
> Q Because they were aground?
> A Yes. * * *

Trial Minutes, pp. 52–53. Captain Leiching's testimony during cross-examination at trial was all but identical. See *id.* at 254–58. See also *id.* at 299–300.

First Mate McCullough testified in the following manner with regard to the way the Bilkay was sitting in the water during the afternoon of December 7, 1965:

> Q When you * * * went up to the scow at about 1540, how was she setting in the water?
> A She had that little list to starboard, offshore.
> Q Was that the same kind of a list that you had seen before?
> A That's right.
> Q And even though some bales had been changed around, she still had a list?
> A Yes * * *
> Q Didn't that seem strange to you?
> A No, because they lay aground on the inshore side.
> Q Did you know that the Bilkay was aground?
> A No, I didn't at the time.
> Q When you say they lay aground on the inshore side, what do you mean by that?
> A * * * when they load them, unless it is tip-top water and I see it near high water, that they lay aground to show that the list was on the outside.

Trial Minutes, pp. 63, 65.

The court finds that this testimony refutes the objection(s) at trial of both Consolidated and Red Star to a subsequent hypothetical question the plaintiff asked marine surveyor Richard Louis. See generally Trial Minutes, pp. 145–50, 159–60.

15. A cartographic technician for the United States Coast and Geodetic Survey in New York testified that the tide on December 7, 1965 at Newburgh was high at 10:54 a. m. and low at 5:24 p. m. See Trial Minutes, p. 372.

16. See Trial Minutes, p. 432.

(4) that approximately eleven feet of water were required to keep the loaded scow fully afloat;[17] (5) that the shifting of the top bales inward to port did not appreciably change the list to starboard; (6) that the damage to the bottom plates was found to be relatively new, probably not older than two weeks, by both surveyors who examined the Bilkay in drydock on December 16th;[18] (7) that the scraped barnacles[19] indicated that the scow was pivoting[20] and underway[21] at the time the damage occurred; and (8) that the list to starboard became a severe port list once the scow was freed in open water from the centerline equilibrium provided by the tug clearly indicates, and the court so finds, that the port side of the bottom of the Bilkay was aground at Consolidated's dock at 3:40 p. m. on December 7, 1965 and that the damage thereto was caused when the Rockland County pulled the scow away from the bulkhead to begin the voyage down river.

This court has held that the type of charter involved herein is not a demise charter and that a plaintiff must prove negligence and that the negligence was the proximate cause of the damage. See B. W. King, Inc. v. Consolidated Iron & Metal Co., 310 F.Supp. 471 (S.D.N.Y. 1970).

■■ In this case, Consolidated had the duty of using reasonable care to provide a safe berth. Smith Scow Corp. v. Consolidated Iron & Metal Co., 275 F.2d 367 (2d Cir. 1960). At trial, Consolidated's president, Laskin, testified that so far as he knew the river bottom at the bulkhead was silt and clay; that the depth of the water was checked periodically; that the crane operator had standing instructions to pick out of the water any scrap which fell overboard;

and that the berth had been dredged in July, 1964. Trial Minutes, pp. 432–35. But grounding cases are as changing as the tide. Thus, while there was no showing, for example, that the river bottom at Consolidated's dock was hard or irregular between August 23 and 26, 1957 in *Smith Scow,* supra, the evidence adduced in this case clearly shows that the plates of the Bilkay were damaged by hard and/or irregular objects embedded in or sitting on the bottom on December 7, 1965. The court finds that these objects made the berth unsafe.

■■ The Court of Appeals for the Second Circuit has pointed out that a wharfinger is not an insurer, but that the duty of exercising reasonable care requires the taking of reasonable precautions to remove underwater obstructions that might otherwise endanger vessels moored to his pier. Berwind-White Coal Mining Co. v. City of New York, 135 F.2d 443, 445 (2d Cir. 1943). In a later case before the same Court, the appellant pier owner argued that there was no showing at trial of knowledge on its part of the existence of a hard ridge shoal at the point where the grounding in question occurred. The Court affirmed, however, the trial court's finding that appellant should have ascertained the existence of the hard ridge. Red Star Barge Line, Inc. v. Lizza Asphalt Construction Co., 264 F.2d 467 (2d Cir. 1959) (Burger, J.). See Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1899); Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc., 354 F.2d 476, 480 (4th Cir. 1966). In the case at bar, there was no adequate refutation of the testimony of both the master and first mate of the Rockland County that scows were frequently aground at Consolidated's bulkhead. If this then was the

17. Cf. *id.* at 170–71.

18. See *id.* at 145, 340, 341. By way of comparison, surveyor Pillatt was able to distinguish other apparently older and unrelated damage to plates on the starboard side. See *id.* at 360–61.

19. See plaintiff's Exhibit 7.

20. See Trial Minutes, p. 341.

21. See *id.* at 342, 365.

case,[22] Consolidated had, in effect, continuing notice of the necessity to exercise reasonable care to maintain its berth in a safe condition, yet Mr. Laskin's testimony summarized above does not indicate that Consolidated made any specific efforts, reasonable or otherwise, at the time(s) pertinent herein to search for and remove the hazardous objects. Not to have made any such efforts was negligence on the part of Consolidated.

In spite of the finding that Consolidated's berth was unsafe, however, the court is unable to conclude that the Bilkay would have been damaged had it been pulled away from the bulkhead at high tide. The court finds that to have pulled it away at 3:40 p. m. on December 7th was negligence and that this negligence contributed to the bottom damage complained of. The court further finds that this negligence is attributable to the plaintiff itself and to Red Star.

■■ Mr. Hines stood in the shoes of, and acted as, a subagent of the plaintiff, thereby making the plaintiff-principal responsible for any acts of negligence on his part. The court finds that he clearly had the final say, insofar as the plaintiff-owner was concerned, as to when the scow would leave the bulkhead and that it was negligence on his part to have allowed the Bilkay to depart while she was aground. Mr. Hines, a former scow captain presumably well aware of the actions and reactions of a loaded barge, was dissatisfied with the Bilkay's trim on December 7th. When the list to starboard did not appreciably change after several tons of bales on the top tier were moved to the port side, the court finds that he should have known

what was in fact the case, to wit, that the list was due to the port side's being aground.[23]

■ Both the master and first mate of the Rockland County were well aware that scows were frequently aground at Consolidated's bulkhead. Their testimony also indicated that they knew that loaded scows could therefore be safely removed only at or near high tide and that their tug waited until such time before moving even in the face of premature orders to the contrary. Thus, to have pulled the heavily-laden Bilkay away from the bulkhead when the water was nowhere near high tide and when the scow was in fact aground was a failure on the part of the Rockland County "to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service"[24] for which Red Star is liable.

Since the evidence clearly shows that Consolidated and Red Star were both tort-feasors and also that the plaintiff was contributorily negligent, this case presents questions of liability, the difficulty of which has not been lessened by the Supreme Court's decision in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L. Ed. 318 (1952). Justice Black, the author of the opinion, has since characterized the decision as follows:

In *Halcyon* * * * we held that the system of compensation which Congress established in the Longshoremen's and Harbor Workers' Compensation Act as the sole liability of a stevedoring company to its employees prevented a shipowner from shifting all or part of his liability to the in-

22. The inference is, of course, that Mr. Laskin knew this, but even if he did not have actual knowledge, the court finds that he should have known and that Consolidated therefore should have attempted to ascertain the existence of the hazardous objects.

23. Moving the top bales to port, while not causing the grounding, obviously aggravated the condition.

24. Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 76 L.Ed. 699 (1932); M. P. Howlett, Inc. v. Tug Michael Moran, 425 F.2d 619, 623 (2d Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970).

jured longshoreman onto the stevedoring company, the longshoreman's employer.[25]

If this then is the specific proposition of law for which *Halcyon* stands, the court finds that it is not controlling precedent in the case at bar, certain perplexing[26] and oft-criticized[27] language in the opinion notwithstanding.

■ The initial question for determination in this non-collision, property damage case is whether or not the plaintiff's contributory negligence is a bar to any recovery on its part. The court concludes that it is not. See, e. g., Commercial Transport Corp. v. Martin Oil Service, Inc., 374 F.2d 813 (7th Cir. 1967); Bouker Contracting Co. v. Williamsburg Power Plant Corp., 130 F.2d 96 (2d Cir. 1942). See also White Oak Transportation Co. v. Boston, Cape Cod & New York Canal Co., 258 U.S. 341, 42 S.Ct. 338, 66 L.Ed. 649 (1922). Such a conclusion is implicit in Paragon Oil Co. v. Republic Tankers, S.A.[28] where the Court of Appeals for the Second Circuit indicated that a party derelict in its duty of providing a safe berth may lessen the amount of damages for which it is responsible by showing negligence, or lack of diligence, on the part of the person wronged in failing to take steps to lessen certain or even probable damages. See 310 F.2d at 173–174.

At the close of Consolidated's case at trial, Red Star's counsel moved to dismiss the impleading petition on the ground, *inter alia*, that Consolidated could not implead a joint tort-feasor. But the language of Rule 14(c), F.R. Civ.P., which governs this case[29] of purely admiralty and maritime claims within the meaning of Rule 9(h), clearly allows such an impleading. The rule reads as follows:

Admiralty and Maritime Claims. When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant *who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences.* In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff.[30]

■ Having thus concluded that the plaintiff, although guilty of contributory negligence, is nevertheless entitled to recover against both Consolidated and Red Star, the apportionment of liability and the issue of whether or not Consolidated and Red Star are jointly and sev-

---

25. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 325, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964) (Black, J., dissenting) (footnote omitted).

26. For perhaps the most recent expression of post-*Halcyon* consternation in this Second Circuit, see Benazet v. Atlantic Coast Line Railroad Co., 315 F.Supp. 357 (S.D.N.Y.1970), aff'd, 442 F.2d 694 (2d Cir. 1971).

27. See, e. g., Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Calif.L.Rev. 304 (1957).

28. 310 F.2d 169 (2d Cir. 1962), cert. denied sub nom. Yacimientos Petroliferos Fiscales v. Paragon Oil Co., 372 U.S. 967, 83 S.Ct. 1092, 10 L.Ed.2d 130, rehearing denied, 373 U.S. 947, 83 S.Ct. 1536, 10 L.Ed. 2d 703 (1963).

29. See ¶2 of the Order of the Supreme Court of Feb. 28, 1966, 383 U.S. 1031.

30. Emphasis added. See also Note of the Advisory Committee on Rule 14 generally.

erally liable to the plaintiff remain to be determined. The one aspect of this problem which is clear-cut is "our obstinate cleaving to the ancient rule which has been abrogated by nearly all civilized nations,"[31] namely, that there be an *equal* division of damages among vessels jointly responsible for a collision. Compare, for example, the reasoning of the trial court in N. M. Paterson & Sons, Ltd. v. City of Chicago, 209 F. Supp. 576 (N.D.Ill.1962), with that of the Court of Appeals reversing the decision, 324 F.2d 254 (7th Cir. 1963), albeit essentially on a determination that a crucial finding of fact on the part of the trial court was clearly erroneous.[32] This court, which is neither entitled to deviate from the strict traditional standard of moiety nor inclined to do so on the facts herein, concludes that the rule also applies, in essence, to this non-collision case. See White Oak Transportation Co. v. Boston, Cape Cod & New York Canal Co., supra. Apportioning liability then on a pro rata basis, the plaintiff, being contributorily negligent, is entitled to recover only two thirds of its damages from Consolidated and Red Star. The court also concludes that whereas joint tort-feasors are generally held to be jointly and severally liable, the traditional damage rule in admiralty property damage cases has been one of immediate contribution or, better, *division* as opposed to subsequent invocation, whenever necessary, of the common law right of contribution from joint tort-feasors. The plaintiff is therefore entitled to recover one third of its damages from Consolidated and one third from Red Star.

\* \* \*

With regard to Consolidated's claim for the loss of its cargo and the resultant salvage expenses, the court finds that the Bilkay was seaworthy at all times pertinent herein and that the Rockland County towed and maneuvered it at all times subsequent to leaving Newburgh in a prudent and seamanlike manner. Both marine surveyors who examined the scow on December 16th found the hull to be watertight and generally seaworthy.[33] The court is not persuaded that the water pumped from the Bilkay's compartment(s) at Verplanck contributed in any significant way to the scow's careening or that the water was even in the hull prior to the partial submerging of the cargo box. The court is persuaded, however, that the Bilkay's initial, severe list to port when the Rockland County released the face wires at Tomkins Cove was caused by the negligent placement of the top part of the load, which then resulted in the loss of bales and careening.

"A party who undertakes the responsibility of loading a scow is liable for the damage caused by the negligent loading of the scow." Shamrock Towing Co. v. Schiavone-Bonomo Corp., 173 F.Supp. 39, 43 (S.D.N.Y.1959), aff'd, 275 F.2d 338 (2d Cir. 1960). In both *Shamrock* and the case at bar, the defendant scrap dealer had primary responsibility for the total amount of the load and its placement aboard the scow. However, unlike *Shamrock*, the runner herein actively directed and supervised the final placement of the top bales; to have done so in the manner heretofore described was negligence for which the

---

31. National Bulk Carriers, Inc. v. United States, 183 F.2d 405, 410 (2d Cir.) (L. Hand, J., dissenting), cert. denied sub nom. Burns Steamship Co. v. National Bulk Carriers, Inc., 340 U.S. 865, 71 S.Ct. 89, 91 L.Ed. 631 (1950).

32. The only apportionment permissible under the rule is pro rata according to the number of vessels (or parties) at fault. See, e. g., The Norwich Victory, 77 F. Supp. 264 (E.D.Pa.1948), aff'd, 175 F. 2d 556 (3d Cir.), cert. denied sub nom. American Dredging Co. v. United States, 338 U.S. 871, 70 S.Ct. 147, 94 L.Ed. 534 (1949).

33. Indeed, the Bilkay was apparently placed in service again after the inspection and without first repairing the bottom damage.

plaintiff is liable. On the other hand, regardless of whether or not Consolidated's president and crane operator felt that Mr. Hines had (or should have had) the final say about the load,[34] there was no showing at the trial that either one of them, especially Mr. Laskin who had perhaps 28 years of experience loading barges at the time in question,[35] who was responsible for the number of bales to be loaded in the first place,[36] and who generally supervised their loading,[37] could not and should not have countermanded Mr. Hines's direction to move in the top bales to port. Not to have done so after the desired effect on the trim had not been achieved was a failure to act as a reasonably prudent person experienced in the trade would have acted for which Consolidated is liable. Cf. Shamrock Towing Co. v. Schiavone-Bonomo Corp., supra.

 The court is unable to conclude that the bales would have been lost but for Mr. Hines's negligence or, on the other hand, that bales would not have been lost but for the ones on top of the fifth tier. In view of this and the heretofore-stated rule on the division of damages, the court concludes that Consolidated is entitled to recover fifty percent of its loss from the plaintiff.

* * *

In summarizing this opinion, which represents the court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P., in answer to the specific questions set forth in the Pre-Trial Order,[38] the court concludes that Zeller (and Gallagher) were agents and Mr. Hines a subagent of the plaintiff; that the plaintiff, although an undisclosed principal so far as Consolidated was concerned, is nevertheless entitled to recover the unpaid charter hire from Consolidated; that the bottom damage to the Bilkay, which was seaworthy at all pertinent times, was caused by negligence on the part of Consolidated, the plaintiff itself and Red Star for which the plaintiff is entitled to recover one third of its damages from Consolidated and one third of its damages from Red Star; and that the loss of the bales was proximately caused by the negligence of the plaintiff and Consolidated for which Consolidated is entitled to recover fifty percent of its damages from the plaintiff. This opinion shall serve as a decision of any and all motions, decision of which was reserved at the time of trial. The parties are hereby directed to settle an appropriate interlocutory decree within 30 days.

So ordered.

---

34. See, e. g., Trial Minutes, pp. 455, 225–26. But compare *id.* at 508.

35. Cf. Trial Minutes, p. 430. The crane operator also had had considerable experience loading scows for Consolidated. See *id.* at 226–27.

36. While there was no conclusive evidence adduced at trial that the Bilkay was overloaded, the court, on the other hand, is unable to conclude that the scow was not overloaded or that a top heavy condition would have (potentially) existed had the remaining bales not been loaded on top of the completed fifth tier.

37. See Trial Minutes, pp. 423–24.

38. Only the questions regarding liability having been tried, the questions of damages will now be tried as soon as counsel can be heard.