ALLIED CHEMICAL CORPORATION

v.

The TUG CARVILLE and TUG CONDOR, their engines, tackle and equipment, Southern Transportation Company, Inc., and Delaware River Terminal, Inc.

Civ. A. No. 291 of 1965.

United States District Court, E. D. Pennsylvania.

June 29, 1972.

Walter L. Hopkins, Wilson & Hopkins, New York City, for plaintiff.

John C. Penders, Marshall, Dennehey & Warner, P. A., Philadelphia, Pa., for Delaware River Terminal, Inc.

James F. Young, Krusen, Evans & Byrne, Philadelphia, Pa., for defendant Southern Transportation Co., Inc. and Tugs Condor and Pinners Point.

FINDINGS OF FACT, DISCUSSION CONCLUSIONS OF LAW AND ORDER

HANNUM, District Judge.

FINDINGS OF FACT

1. Allied Chemical Corporation (hereafter Allied) is a corporation organized and existing according to law, and at all times material hereto was the owner of the Barge A.C. No. 2.

2. Defendant Southern Transportation Co., Inc. (hereafter Southern) is a corporation organized and existing according to law and during the year 1963 was engaged in towing various floating equipment of Allied, including the Barge A.C. No. 2, under a contract between the parties dated October 13, 1959.

3. Defendant Delaware River Terminal, Inc. (hereafter DRT) is a corporation organized and existing according to law and was during 1963 the owner and operator of Pier 179 North, a terminal used for among other things, the berthing, discharging, and loading of

barges, including Allied's Barge A.C. No. 2. ·

4. Defendant Southern, during the year 1963 and at all times material hereto, was the operator of the Tugs CONDOR, and PINNERS POINT which were from time to time during 1963 engaged in towing the Barge A.C. No. 2.

5. Throughout 1963 Southern, by means of the Tugs PINNERS POINT and CONDOR, regularly towed the Barge A.C. No. 2 on a triangular route from Hopewell, Virginia to Delaware River Terminal, then to North Claymont, Delaware, and return to Hopewell, Virginia.

6. The Barge A.C. No. 2 was an unmanned steel barge 195 feet long, 35 feet in beam, with a depth of 9 feet 9 inches, a freeboard of 32 inches and equipped with 8 cylindrical tanks for the carriage of cargo above decks and a below deck rectangular compartment for the carriage of liquid cargo also.

7. The maximum permissible draft of Barge A.C. No. 2 was 7 feet 1 inch.

8. Throughout 1963 the berth provided by DRT and at which the Barge A.C. No. 2 was customarily berthed, in an area commonly called Pier 179 North, consisted of two clusters or sets of piling extending vertically above the surface of the water and the barge was moored with its port side to those clusters or dolphins of pilings with its bow pointed to the shoreline at the Pier 179 North plant.

9. Throughout all relevant times in 1963 there was in existence a contract dated July 12, 1961 between ALLIED and DRT which provided in relevant part:

"III  SERVICES

B. In connection with the furnishing of such services TERMINAL shall at its own expense:

(8) Provide complete and safe barge mooring and berthing facilities, cargo hoses, electric power, services of certified tankerman, supervision, labor, and any other facility, equipment, or services required to receive material from and discharge material into barges designated by PLASTICS. Barges will be loaded or unloaded promptly on arrival, 24 hours a day, 7 days a week without overtime payment by PLASTICS. TERMINAL shall keep berth and access channel dredged to a minimum depth of nine (9) feet during all weather conditions, and berth shall be capable of safely accommodating a barge forty-five (45) feet wide and two hundred and fifty (250) feet long."

10. DRT was responsible for the loading and discharging of the Barge A.C. No. 2 at Pier 179 N.

11. The logs of the Tug CONDOR contain the following entries relating to the Barge A.C. No. 2:

January 5, 1963—5 a. m. "Barge loaded and aground. Laid by for the tide."

January 5, 1963—6:40 a. m. "Left Pier 179 with A.C. No. 2 loaded. Flood."

February 9, 1963—8 a. m. "Left Pier 179 with Barge A.C. No. 2 Barge aground, Loaded."

March 5, 1963—1:45 p. m. "Docked A.C. No. 2, Claymont, Delaware."

March 5, 1963—9:40 p. m. "A.C. No. 2 loaded and aground inshore." Ebb.

March 5, 1963—9:50 p. m. "Left Claymont with A.C. No. 2 loaded. Ebb."

April 21, 1963—8:05 p. m. "Docked Pier 179, Philadelphia. Barge dragged bottom going to dock."

April 30, 1963—3:00 a. m. "Leave with A.C. No. 2 loaded, barge aground, pulled off."

April 30, 1963—3:30 a. m. "Underway" SW Rain, Ebb.

June 19, 1963—11 a. m. "Leave Pier 179, A.C. No. 2 loaded, barge aground, pulled off." Clear, Flood.

September 8, 1963—10:00 a. m. "Pier 179 waiting for barge to load. Barge aground while loading at Pier."

12. The log of the tug PINNERS POINT contains the following entries relating to the barge A.C. No. 2:

"January 21, 1963 2200 hours—docked A.C. #2 at Pier 179.

January 22, 1963 1945 hours—left Pier 179 A.C. #2 for Claymont, barge has a port list.

2355 hours—docked A.C. #2 at Claymont.

January 23, 1963 1040 hours—left Claymont A.C. #2 for Wilson Shipyard in Wilmington, Del.

January 23, 1963 1330 hours docked A.C. #2 at Wilson Shipyard Wilmongton (sic) (barge A.C. #2 had hole in bottom)"

13. The Court takes judicial notice of the following tidal information taken from the tide tables published by the U. S. Coast & Geodetic Survey for the year 1963. Using Pier 80 North as a reference station, the approximate tides at pier 179 N. are as follows:

1. On January 5, 1963, at pier 179 North:
   a. Low water occurred at 0416
   b. High water occurred at 0942
   c. The range of the tide was 6.5 feet

2. On February 9, 1963, at pier 179 North:
   a. High water occurred at 0207
   b. Low water occurred at 0909
   c. The range of the tide was 5.5 feet

3. On April 21 and 22, 1963, at pier 179 North:
   a. Low water occurred at 1859
   b. High water occurred at 0010
   c. The range of tide was 6.8 feet

4. On April 30, 1963, at pier 179 N.
   a. Low water occurred at 0242
   b. High water occurred at 0809
   c. The range of tide was 5.8 feet

5. On June 19, 1963, at pier 179 N.
   a. Low water occurred at 0745
   b. High water occurred at 1247
   c. The range of tide was 6.2 feet

6. On September 8, 1963, at pier 179 N.
   a. High water occurred at 0555
   b. Low water occurred at 1317
   c. The range of tide was 6.4 feet

14. The Court takes judicial notice of the following tidal information taken from the tide tables published by the U. S. Coast & Geodetic Survey for the year 1963. Using Marcus Hook, Pennsylvania as a reference station, the approximate tides at Claymont, Delaware are as follows:

1. On March 5, 1963, at Claymont, Delaware:
   a. High water occurred at 2059
   b. Low water occurred at 0354
   c. The range of tide was 5.1 feet.

15. Four of the groundings which are recorded in the log of the tug CONDOR occurred nearest the time of approximate low water at Pier 179 North.

16. Two of the groundings which are recorded in the log of the tug CONDOR occurred closer to the time of high water at pier 179 North.

17. The grounding recorded in the log of the tug CONDOR at Claymont, Delaware occurred closest to the time of high water.

18. There is no evidence in the record of any abnormal weather conditions on the dates in question.

19. January 5, 1963, is the only day on which the tide tables show a height below mean low water at Pier 179 N. (−0.2 feet).

20. The range of tide between low water and high water at Pier 179 N. on the Delaware River is approximately 6 feet.

21. The bottom composition at the Pier 179 North barge berth facility during 1963 was described as having been composed of silt or mud material by Mr. Alex Brunner and by Mr. Gibbons of DRT, by Captain Jarvis of the Tug CONDOR as having been "a kind of rocky, gravel bottom * * * just

pure, hard sand, rocks and gravel" and by Witness Winall as a "sandy bottom".

22. Records of American Dredging Company introduced in evidence indicate that the bottom material at Pier 179 North was sand and gravel as found during dredging of the entire facility in August of 1962 which included the dredging of the "deep water pier" to a depth in excess of 30 feet.

23. The following schedule of dredging was performed by American Dredging Company at Pier 179 North.

a. Pier 179 N. Barge Berth, removed 712 cubic yards of sand and gravel on August 8, 1962.

b. Pier 179 N. Barge Berth and South Side, removed 2694 cubic yards of sand and gravel on August 9, 1962.

c. Pier 179 N. South Side, removed 1719 cubic yards of material on August 10, 1962.

d. Sometime prior to or on April 13, 1963, 2139 cubic yards of bottom material was removed from Pier 179 North.

e. Sometime prior to or on June 20, 1963, 6146 cubic yards of bottom material was removed from the South side of Pier 179 North.

24. The area dredged included the barge berth at Pier 179 N.

25. Captain Jarvis at some time while the Barge A.C. No. 2 was in her customary berth at Pier 179 North thrust a boathook down the port side of the Barge A.C. No. 2 and found that there was only 3 to 4 feet of water along the port side of the barge.

26. Captain Jarvis had been towing barges for Southern Transportation Company since 1957.

27. Captain Jarvis made frequent trips to the DRT Pier 179 North.

28. Mr. Alex Brunner identified a sounding diagram which he had prepared on June 23, 1963 following the conduct of dredging at Pier 179 North and testified that he had on that day found a minimum of ten feet depth in the barge berth at mean low water.

29. The sounding chart prepared by Alex Brunner after soundings on June 23, 1963 was based on soundings taken after removal of 6,146 cubic yards of bottom material by American Dredging Company prior to or on June 20, 1963.

30. At no time did the Barge A.C. No. 2, on approaching or leaving her berth at Pier 179 North, have a draft in excess of 6 feet.

31. On January 21, 1963, the Tug PINNERS POINT towed the Barge A.C. No. 2 up Chesapeake Bay and into her berth at Pier 179 North without any evidence whatever that the barge was leaking or damaged in any way.

32. On January 22, 1963, the Tug PINNERS POINT towed the barge from her customary berth at Pier 179 North and Captain Jarvis immediately noticed that the barge had developed a list; shortly thereafter, the barge was placed on the marine railway at Wilson Marine Repair Terminal in Wilmington, Delaware, and the Captain of the PINNERS POINT noticed that the barge had a hole in her bottom.

33. Allied offered no evidence regarding the extent of damage, if any, to the A.C. No. 2 which resulted from the March 5, 1963 grounding at the Allied Chemical facility at Claymont, Delaware.

34. Allied offered no evidence regarding the type of bottom at the Claymont, Delaware berth.

35. At such intervals when the Barge A.C. #2 was lying aground in her berth at Pier 179 North she was in the charge and custody of DRT.

36. At such intervals when the Barge A.C. No. 2 was lying aground at Allied's own facilities at Claymont, Delaware she was in the charge and custody of Allied.

37. The Tug CONDOR left the barge berth at Pier 179 N. with A.C. No. 2 aground and loaded on the following dates and times.

a. February 9, 1963, at 8:00 a. m.

b. April 30, 1963, at 3:00 a. m.

c. June 19, 1963, at 11:00 a. m.

38. The Tug CONDOR left the barge berth at Claymont, Delaware with A.C. No. 2 aground and loaded on March 5, 1963 at 9:50 a. m.

39. The groundings referred to at the barge berth at Pier 179 N. were primarily along the port side of Barge A.C. No. 2.

40. Surveyor Quistgaard testified for DRT to the effect that, assuming the bottom material in the barge berth had been soft mud, the barge could not have sustained the damage described in the surveys by grounding in the Pier 179 North barge berth.

41. Surveyor Fife testified that all of the damage that he surveyed and included in his reports had been, in his opinion, caused by grounding and not by deterioration.

42. Surveyor Fife also testified that, so far as he knew, all of the grounding damage could have occurred as a result of the March 5, 1963 grounding at Allied's North Claymont dock.

43. Surveyor Yohe of the American Bureau of Shipping testified that he had inspected the Barge A.C. No. 2 on September 5, 1962 and had then found her free of any bottom damage other than inconsequential dents and also free of any noticeable deterioration in her bottom plates.

44. A survey of the Barge A.C. No. 2 was conducted on January 23, 1963 and one bottom plate was repaired. The United States Coast Guard Drydock Examination Booklet for this drydocking mentions the installation of a one and one-half foot by three foot insert on the port side.

45. The Coast Guard Drydock Examination Booklet reports a finding of a small hole in a portion of "wasted" plating just to port of the center line of the AC–2 and that the plate was "cropped out" about three feet to "good material."

46. DRT was not informed of the January 23, 1963 drydocking or promptly notified that a grounding had allegedly occurred at Pier 179 North on January 22–23, 1963.

47. The January 23, 1963 survey produced no evidence of any other bottom damage to the A.C.–2 which appears in the record and Captain Jarvis who actually witnessed the survey and examined the bottom personally does not recall seeing any other plate damage other than the small hole.

48. The AC–2 was placed back in services following the installation of the abovementioned insert.

49. Subsequent to January 23, 1963, Barge A.C. No. 2 was drydocked for bottom survey and repairs at the following times and places.

   a. August 1963, at Wilson Shipyards. Inc., Wilmington, Delaware.

   b. October 1963, at Brambleton Plant of the Norfolk Shipbuilding & Drydock Corporation, Norfolk, Virginia.

   c. February 1966, at Brambleton Plant of the Norfolk Shipbuilding & Drydock Corporation, Norfolk, Virginia.

50. Representatives of Southern were not invited to Allied's survey of the Barge A.C. No. 2 in 1963 and subsequently.

51. Representatives of DRT were not invited to Allied's survey of the Barge A.C. No. 2 in 1963 and subsequently.

52. The subsequent survey reports show substantial damage to the bottom plating and internals of Barge A.C. No. 2.

53. The damage repaired on January 23 and 24, 1963 while the Barge A.C. No. 2 was drydocked in the Wilson Shipyard at Wilmington, Delaware was caused by wasting of bottom plating and was not caused by grounding.

54. The Tug PINNERS POINT was not negligent in the handling of the Barge A.C. No. 2.

55. The Tug CONDOR was negligent when she pulled the loaded barge A.C. No. 2 from her berth at Pier 179 N. on February 9, April 30, and June 19, 1963,

when she knew that Barge A.C. No. 2 was loaded and aground.

56. The Tug CONDOR was negligent when she pulled the loaded Barge A.C. No. 2 from her berth at Claymont, Delaware on March 5, 1963, when she knew that Barge A.C. No. 2 was loaded and aground.

57. The negligence of the Tug CONDOR contributed to the damage sustained by the Barge A.C. No. 2.

58. DRT failed to maintain a 9 foot depth of water at Pier 179 North as required by their contract with Allied.

59. DRT failed to maintain a safe berth for Barge A.C. No. 2.

60. DRT's failure to maintain an adequate depth of water and a safe berth at Pier 179 North caused the Barge A.C. No. 2 to lay aground which contributed to the damage sustained by the Barge A.C. No. 2.

61. Allied was responsible for the grounding of A.C. No. 2 at Allied's own facilities at Claymont, Delaware.

62. The grounding of A.C. No. 2 while she was alongside Allied's facilities at Claymont, Delaware contributed to the damage sustained by the Barge A.C. No. 2.

63. The extent of the damage to Barge A.C. No. 2 caused by the negligence of the Tug CONDOR cannot be determined.

64. The extent of the damage to Barge A.C. No. 2 caused by DRT's failure to maintain an adequate depth and safe berth cannot be determined.

65. The extent of the damage caused at Allied's own Claymont, Delaware berth cannot be determined.

66. The total amount of damage sustained because of grounding was $47,-829.33. This is the reasonable cost of repairs made to Barge A.C. No. 2.

67. On February 5, 1964 Allied paid $26,191.18 to the Norfolk Shipbuilding & Drydock Corporation for repair work on the Barge A.C. No. 2.

68. On March 22, 1966 Allied paid $21,638.15 to the Norfolk Shipbuilding & Drydock Corporation for repair work on Barge A.C. No. 2.

## DISCUSSION

This is an admiralty action involving property damage to plaintiff's barge due to grounding.

### Liability of DRT

DRT entered into a contract with Allied which provided that they would provide complete and safe barge mooring and berthing facilities. In this regard they agreed to keep the berth and access channel dredged to a minimum depth of nine (9) feet during all weather conditions and that the berth could safely accommodate a barge forty-five (45) feet wide and two hundred and fifty (250) feet long. We have found that the barge berth was not safe for accommodating barge A.C. No. 2, and that DRT breached its contractual duty to maintain the agreed upon depth during all weather conditions for which they are liable.[1]

### Liability of Southern and the Tug CONDOR

The Tug CONDOR left the barge berth at Pier 179 N. with Barge A.C. No. 2 aground and loaded on the following dates and times:

a. February 9, 1963, at 8:00 a. m.

b. April 30, 1963, at 3:00 a. m.

c. June 19, 1963, at 11:00 a. m.

The Tug CONDOR left the barge berth at Claymont, Delaware with Barge A.C. No. 2 aground and loaded on March 5, 1963 at 9:50 a. m.

To have pulled the loaded Barge A.C. No. 2 from her berth when she was in fact aground was a failure on the part of the CONDOR "to exercise

1. Paragon Oil Co. v. Republic Tankers, 310 F.2d 169 (2d Cir. 1962), cert. denied sub nom. Yacimientos Petroliferos Fiscales v. Paragon Oil Co., 372 U.S. 967, 83 S.Ct. 1092, 10 L.Ed.2d 130, rehearing denied, 373 U.S. 947, 83 S.Ct. 1536, 10 L.Ed.2d 703 (1963), Colonial Sand & Stone Co. v. Fehlhaber Corporation, 326 F.2d 98 (2d Cir. 1964).

such reasonable care and maritime skill as prudent navigators employ for the performance of similar services" for which Southern and the Tug CONDOR are liable.[2]

## Damages

The evidence in the case establishes that the Barge A.C. No. 2 was aground at Allied's berth in Claymont, Delaware. At such times Allied was responsible for the safety of its barge and the condition of its own facilities. Allied offered no evidence regarding the type of bottom at its Claymont, Delaware berth. Allied's expert at trial testified as follows:

Q. Could the damage which you have recorded in L–9 and L–10 have been caused solely by a grounding on March 5, 1963 at the Allied Chemical facility?

A. Not knowing the facilities, I have got to say that it could possibly be caused by that.

It is thus apparent that three forces can be found to have contributed to the bottom damage found on the Barge A.C. No. 2.

1. DRT's failure to maintain a safe berth with adequate water as required by their contract with Allied.

2. Southern and the Tug CONDOR'S negligence in pulling the loaded Barge A.C. No. 2 from her berth without first waiting for high water or lightening her load.

3. The grounding of the Barge A.C. No. 2 at Allied's own pier while in the custody and control of Allied.

■ Under these circumstances at least three alternatives appear available to the Court in resolving this dispute. We can absolve DRT, Southern, and the CONDOR, from any liability because of the grounding of Barge A.C. No. 2 at Claymont, Delaware. We can absolve Allied of any responsibility because on balance it is arguable that a single incident of grounding to which they are responsible should not insulate other wrongdoers from any liability. Finally, we can hold each party responsible for the damage and apportion the loss equally.

We choose to hold that under the facts of this case the damages should be apportioned equally, that is, each party is responsible for one-third (⅓) of the loss. This we believe to be consistent with the traditional maritime practice of division of damages in collision cases where the fault is mutual.[3]

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this proceeding.

2. The breach by DRT of its contract with Allied contributed to the damages sustained by Barge A.C. No. 2.

3. The negligence of the Tug CONDOR in pulling Barge A.C. No. 2 when she was loaded and aground contributed to the damage sustained by Barge A.C. No. 2.

4. Allied is responsible for the damage to Barge A.C. No. 2 when she lay aground at Allied's berth at Claymont, Delaware.

5. Southern is responsible for the negligence of the Tug CONDOR.

6. The damage caused to Barge A.C. No. 2 is apportioned equally between Allied, DRT, and Southern.

2. Bilkay Holding Corp. v. Consolidated Iron & Metal Co., 330 F.Supp. 1313 (S.D.N.Y.1971); Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L. Ed. 699 (1932).

3. The Schooner Catherine v. Dickinson, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1855); Daniels Towing Service, Inv. v. Nat. Harrison Associates, Inc., 432 F.2d 103 (5th Cir. 1970); Bilkay Holding Corp. v. Consolidated Iron & Metal Co., supra; Moran Towing Corp. v. M. A. Gammino Construction Co., 409 F.2d 917 (1st Cir. 1969); Nickert v. Puget Sound Tug & Barge Company, 335 F.Supp. 1158 (W.D.Wash.1972).

## ORDER

And now, this 29th day of June, 1972, for the reasons specified in the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered that judgment be entered as follows:

1. In favor of plaintiff against the Southern Transportation Co., and the Tug CONDOR for $15,943.11.

2. In favor of plaintiff against the Delaware River Terminal Co. for $15,-943.11.

Since plaintiff has contributed to his own injury, each party is to bear its own costs and the judgment shall be entered without interest.